David L. Mazaroli (DM-3929)
Attorney for Plaintiff
11 Park Place – Suite 1214
New York, NY 10007-2801
Tel. (212)267-8480
Fax. (212)732-7352
------------------------------------------------------------- x

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

| | | |
|---|---|---|
| GREAT NORTHERN INSURANCE CO. | : | ECF CASE |
| Plaintiff, | : | 08 Civ. 03308 (GWG) |
| - against - | : | **AFFIDAVIT OF DAVID L. MAZAROLI IN OPPOSITION** |
| | | **TO THE VENUE CHALLENGE** |
| BLUE ANCHOR LINE; BLUE ANCHOR | : | **MOTION OF DEFENDANTS** |
| LINE A DIVISION OF TRANSPAC | | |
| CONTAINER SYSTEM LTD.; KUEHNE & | : | **BLUE ANCHOR LINE, et al.** |
| NAGEL, INC.; KUEHNE & NAGEL S.A.; | | |
| HANJIN SHIPPING CO. LTD.; CONTAINER | | |
| PORT GROUP, INC.; | | |
| Defendants. | | |

-------------------------------------------------------------x

STATE OF NEW YORK     )
                                          ) ss:
COUNTY OF NEW YORK   )

David L. Mazaroli, being duly sworn, deposes and says:

1.        I am an attorney admitted to practice before this Honorable Court and the attorney of record for plaintiff. As such I am familiar with the facts, pleadings and procedural history of this litigation.

2.        This affidavit is respectfully submitted on behalf of  in opposition to the motion of defendants Blue Anchor Line ("BAL"), Kuehne & Nagel, Inc. ("K&N Inc.") and Kuehne & Nagel S.A. ("K&N S.A.") to dismiss the complaint based on a permissive law and jurisdiction clause.

3.    A memorandum of law in opposition has also been submitted on behalf of plaintiff.

4.    Annexed hereto as **Exhibit 1**  is a copy of the New York State Department of State Entity Information printout for K&N Inc. dated September 2, 2008.

5.    Annexed hereto as **Exhibit  2** is a excerpt from the deposition of K&N Inc. by witness Michael E. Breyman taken in SDNY Civil Action 01-8143 on June 13, 2002.

6.    Annexed hereto as **Exhibit 3** is a copy of the Kuehne & Nagel freight rate quote CHS-RCOT-73YL2G dated June 8, 2007 (Doc. 000018) which was produced in this action by moving defendants with their Rule 26(a)(1) disclosures.

7.    Annexed hereto as **Exhibit 4** are copies of three K&N Inc. invoices (Docs 0021-23) addressed to plaintiff's subrogor, Pannotia Vineyards, which were produced in this action by moving defendants with their Rule 26(a)(1) disclosures.

8.    Annexed hereto as **Exhibit 5** is a copy of the August 13, 2008 letter from Ernest H. Gelman, Esq., counsel for moving defendants, with the accompanying terms and conditions of the K&N Inc. invoices.

9.    Annexed hereto as **Exhibit 6** is a copy of an e-mail  dated June 11, 2007 1:15 p.m. from K&N Inc.'s  Robin Corlett which was produced in this action by counsel for moving defendants.

David L. Mazaroli

Sworn to before me this
3rd day of September 2008

Notary Public

GALEN C. THOMAS
Notary Public, New York State
No. 02TH4685184
Qualified in Kings County
Commission Expires April 30, 2010

3

# EXHIBIT 1

# NYS Department of State

## Division of Corporations

## Entity Information

Selected Entity Name: KUEHNE + NAGEL INC.

Selected Entity Status Information

**Current Entity Name:** KUEHNE + NAGEL INC.
**Initial DOS Filing Date:** JUNE 30, 1966
**County:** NEW YORK
**Jurisdiction:** NEW YORK
**Entity Type:** DOMESTIC BUSINESS CORPORATION
**Current Entity Status:** ACTIVE

Selected Entity Address Information

**DOS Process (Address to which DOS will mail process if accepted on behalf of the entity)**
C/O C T CORPORATION SYSTEM
111 EIGHTH AVENUE
NEW YORK, NEW YORK, 10011

**Chairman or Chief Executive Officer**
ROLF ALTORFER
10 EXCHANGE PLACE
19TH FLR
JERSEY CITY, NEW JERSEY, 07302-3978

**Principal Executive Office**
KUEHNE + NAGEL INC.
10 EXCHANGE PLACE
19TH FLR
JERSEY CITY, NEW JERSEY, 07302

**Registered Agent**
C T CORPORATION SYSTEM
111 EIGHTH AVENUE
NEW YORK, NEW YORK, 10011

NOTE: New York State does not issue organizational identification numbers.

Search Results        New Search

Division of Corporations, State Records and UCC Home Page    NYS Department of State Home Page

Exhibit 1

EXHIBIT 2

1580Deposition (Kuehne & Nagel) Breymer

1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------------x

3    FEDERAL INSURANCE COMPANY
     a/s/o Wild Flavors, Inc.,
4                         Plaintiff,
5         -against-                    : 01 Civ. 8143
                                         (MV)
6    BLUE ANCHOR LINE; BLUE ANCHOR LINE
     A DIVISION OF TRANSPAC CONTAINER
7    SYSTEM LTD., TRANSPAC CONTAINER
     SYSTEM LTD., KUEHNE & NAGEL, INC.,
8
9                    Defendants.
     ------------------------------------x
10   KUEHNE & NAGEL, INC.,

11              Third-Party Plaintiffs,

12        -against-

13   HAPAG LLOYD CONTAINER LINIE-GMBH,
     HAPAG LLOYD (AMERICA), INC. and
14   ALLIANZ CANADA, INC.,

15              Third-Party Defendants.
     ------------------------------------x
16
17        DEPOSITION of KUEHNE & NAGEL, INC. by
18   MICHAEL E. BREYMAN, taken by the attorney for
19   Plaintiff, pursuant to Notice, held at the
20   offices of Ernest H. Gelman, Esq., 667 Madison
21   Avenue, New York, New York, on June 13, 2002,
22   commencing at 10:25 a.m.
23

                 TOPIC REPORTING, INC.
24             2517 Highway 35, Suite C-103
                Manasquan, New Jersey 08736
25   888-440-4130                    732-528-8107

2

1
2    A P P E A R A N C E S :
3
4        LAW OFFICES OF DAVID L. MAZAROLI
5             Attorney for Plaintiff
6             11 Park Place, Suite 1214
7             New York, New York 10007
8        BY:  DAVID L. MAZAROLI, ESQ.
9
10       ERNEST H. GELMAN, ESQ.
11            Attorney for Defendants and
12               Third-Party Plaintiffs
13            677 Madison Avenue, 24th Floor
14            New York, New York 10021
15
16       HILL, BETTS & NASH LLP
17            Attorneys for Third-Party Defendants
18               Hapag Lloyd
19            99 Park Avenue, 20th Floor
20            New York, New York 10016-1601
                       Page 1

Exhibit 2

```
21         1580Deposition (Kuehne & Nagel) Breymer
           BY:  MICHAEL J. RYAN, ESQ.
22
23    A L S O   P R E S E N T:
24         BIRGIT LIEHMANN (Nacora Insurance Brokers)
25
```

3

```
1
2          IT IS HEREBY STIPULATED AND AGREED,
3     by and between the counsel for the respective
4     parties hereto, that the filing and sealing of
5     the within deposition shall be and the same
6     hereby are waived;
7          IT IS FURTHER STIPULATED AND AGREED,
8     that all objections, except as to the form of
9     the question, shall be reserved to the time
10    of the trial;
11         IT IS FURTHER STIPULATED AND AGREED,
12    that the within deposition may be signed and
13    sworn to before any Notary Public with the same
14    force and effect as if signed and sworn to
15    before the Court.
```

4

```
1
2     M I C H A E L    E.    B R E Y M A N,
3          having been first duly sworn, was examined
4          and testified as follows:
5     DIRECT EXAMINATION
6     BY MR. MAZAROLI:
7          Q      Please state your full name for the
8     record.
9          A      Michael E. Breyman.
10         Q      What is your residence address, sir?
11         A      712 Brittany Trail.  That's Florence,
12    Kentucky.
13         Q      By whom are you presently employed?
14         A      Kuehne & Nagel.
15         Q      Is that Kuehne & Nagel, Inc.?
16         A      Correct.
17         Q      What is your present title at that
18    company?
19         A      Present title is vice president.
20         Q      Mr. Breyman, I represent the
21    plaintiff in this action, and it's a deposition
22    for purpose of a litigation pending involving the
23    shipment that we will discuss today.  If at any
24    time you cannot understand my question or you
25    require me to repeat it, please do so, because
```

5

```
1                     M. Breyman
2     this transcript may be presented in court in one
3     way or another, and I want to be sure that
4     everything you say is accurate and is what you
5     intended to say; all right?
6          A      (Nodding head.)
7          Q      For how long have you been employed
8     by Kuehne & Nagel, Inc.?
9          A      A little over 11 years.
10         Q      What have your various job -- have
11    there been any job positions you've had with
12    Kuehne & Nagel, Inc. during the 11 years?
```

Page 2

1580Deposition (Kuehne & Nagel) Breymer

```
13        A     Several, yes.
14        Q     What were they?
15        A     I started as the import manager in
16   Cincinnati.  I was then promoted to a regional
17   brokerage manager, then to a branch manager, then
18   to a vice president.
19        Q     In what particular office did you
20   perform all of these duties?
21        A     Cincinnati.
22        Q     Cincinnati?
23        A     Yes.
24        Q     Where is the headquarters for Kuehne
25   & Nagel, Inc.?
```

6

```
 1               M. Breyman
 2        A     Jersey City.
 3        Q     And where is it incorporated, do you
 4   know?
 5        MR. GELMAN:  It's incorporated in New
 6   York, but its headquarters, as Mr. Breyman
 7   said, is in Jersey City.
 8        Q     The headquarters of the Kuehne &
 9   Nagel, Inc. U.S. operation is in Jersey City?
10        A     Correct.
11        MR. MAZAROLI:  And it's a New York
12   corporation, Mr. Gelman?
13        MR. GELMAN:  Yes, it is.
14        Q     By whom were you employed before you
15   became employed with Kuehne & Nagel, Inc.?
16        A     AW Fenton.
17        Q     What was the business of AW Fenton?
18        A     Similar.
19        Q     What is that?
20        A     Freight forwarding and transportation
21   logistics.
22        Q     Is that the business that Kuehne &
23   Nagel, Inc. is presently engaged in?
24        A     Yes.
25        Q     What exactly do you mean by freight
```

7

```
 1               M. Breyman
 2   forwarding and transportation?  Can you be more
 3   specific?
 4        A     International transportation.  My
 5   specialty is Customs brokerage.  I'm a licensed
 6   Customs broker.
 7        Q     What is the obligation of a licensed
 8   Customs broker with respect to international
 9   shipment of cargo, in general?
10        A     Clearance of the imported merchandise
11   in accordance with U.S. Customs regulations.
12        Q     That includes getting it through the
13   FDA, the Food and Drug Administration.
14        A     Yes.
15        Q     In other words, a Customs broker
16   would be responsible for facilitating the
17   shipment through the various formalities of
18   Customs or other regulatory agencies; is that
19   correct?
20        A     Yes.
21        Q     Is there any special training for
```
Page 3

1580Deposition (Kuehne & Nagel) Breymer

```
22   that role that you undertook?
23         A    To become licensed, it's a testing --
24   a test administered by the U.S. Customs service,
25   as well as a background investigation.
```

8

```
 1                      M. Breyman
 2         Q    What is your educational background?
 3         A    Quite a bit of college, no formal
 4   degree.
 5         Q    All right.
 6         A    But again, the brokerage exam
 7   actually has a lower percentage of failure than
 8   the bar exam.
 9         Q    Probably.
10         A    So I've always taken pride in that.
11              MR. GELMAN:  Do we all want to strike
12         that remark?
13              MR. MAZAROLI:  Off the record.
14              (Discussion off the record.)
15         Q    Do you know a company called Blue
16   Anchor Line?
17         A    Yes.
18         Q    What is Blue Anchor Line?  What does
19   it do?
20         A    Difficult for me to explain, maybe --
21         Q    I'll rephrase it.  Is there a
22   relationship between Kuehne & Nagel, Inc. and a
23   company called Blue Anchor Line?
24         A    Yes.
25         Q    What is that relationship?
```

9

```
 1                      M. Breyman
 2         A    The exact relationship -- I would not
 3   be sure of.
 4              MR. GELMAN:  If you know.
 5         Q    Is it a stranger to Kuehne & Nagel,
 6   Inc.?
 7         A    No, not at all.
 8         Q    Am I correct that Blue Anchor is a
 9   non-vessel operating common carrier?
10         A    Correct.
11         Q    Otherwise known as an NVOCC?
12         A    Yes.
13         Q    In essence, Blue Anchor Line is
14   quite the house NVOCC, in quotes, of Kuehne &
15   Nagel; is that correct?
16         A    Yes.
17         Q    Are you here today to testify for
18   Blue Anchor Line?
19         A    Kuehne & Nagel, Inc.
20         Q    Kuehne & Nagel, Inc., a defendant in
21   this litigation?
22         A    Yes.
23         Q    Are there any officers or directors
24   of Blue Anchor Line, Inc. that you work with at
25   Kuehne & Nagel Inc.'s office in Cincinnati?
```

10

```
 1                      M. Breyman
 2         A    No.
 3         Q    Are there any U.S. employees of Blue
```

Page 4

1580Deposition (Kuehne & Nagel) Breymer

13 made this quotation intend to carry out this
14 assignment?
15      A       Are you referring to the selection of
16 Hapag Lloyd as a carrier?
17      Q       I'm referring to a variety of things.
18 For example, it required cooled pre and on
19 carriage.  How did Kuehne & Nagel intend to
20 arrange cooled pre-and on-carriage?
21      A       Through Hapag Lloyd.
22      Q       Through Hapag Lloyd?
23      A       Mm-hmm.
24      Q       With respect to the shipment
25 described in Exhibit 2, did Kuehne & Nagel, hire

                                                    27

1                    M. Breyman
2 Hapag Lloyd to carry the shipment in question
3 from the supplier's premises to the consignee's
4 premises?
5      A       Again, we're -- we're still --
6              (Mr. Gelman confers with the
7      witness.)
8              MR. MAZAROLI:  Mark this document.
9              (Invoice to Kuehne & Nagel's office
10     in Poland marked as Breyman Exhibit 4 for
11     identification.)
12     A       Please repeat your question, or --
13             MR. MAZAROLI:  Would you repeat the
14     last question?
15             (Record read.)
16     A       We need to make clear that this
17 selection was not handled by Kuehne & Nagel,
18 Inc.; the selection was handled in Poland.
19     Q       By whom?
20     A       The Blue Anchor Line affiliate in
21 Poland.
22     Q       Well, how did Blue Anchor Line get
23 involved with this shipment?
24             MR. GELMAN:  If you know.
25     A       I don't know.

                                                    28

1                    M. Breyman
2      Q       Well, isn't it true that someone at
3 Kuehne & Nagel, after it received the booking
4 from Wild Flavors, Inc. for the shipment in suit,
5 then engaged Blue Anchor Line to provide certain
6 services with respect to the shipment?  Isn't
7 that how it works?
8      A       Normally, yes.
9      Q       Blue Anchor Line then issues its own
10 bill of lading and might hire someone else as a
11 subcontractor to do a part of the work; is that
12 correct?
13     A       Correct.
14     Q       And Blue Anchor Line at the time of
15 the shipment in question was the house NVOCC of
16 Kuehne & Nagel, Inc.?
17             MR. GELMAN:  Would you define what
18     you mean by "house NVOCC"?
19     Q       In other words, whenever Kuehne &
20 Nagel, Inc. was engaged for ocean transportation
21 purposes, it would use Blue Anchor Line for such
                        Page 12

```
          1580Deposition (Kuehne & Nagel) Breymer
22    services?
23        A       Normally, yes.
24        Q       Kuehne & Nagel, Inc. doesn't engage
25    the Danzas non-vessel operating common carrier,
```

29

```
 1
 2                  M. Breyman
 3    does it?
 4        A       Occasionally there are co-load
 5    arrangements, yes.
 6        Q       Was there a booking note for this
 7    shipment from Wild Flavors, Inc. to Kuehne &
 8    Nagel, Inc.?
 9        A       I don't know.
10        Q       Who would know that?
11        A       A booking note from the supplier to
      --
12        Q       No, from whomever hired Kuehne &
13    Nagel, Inc.  I imagine Wild Flavors, Inc.
14        A       I don't know of a booking note, or I
15    don't know who would have one.
16        Q       The shipment referred to in Exhibit
17    2, how did it get from the supplier's premises in
18    Poland to the port of loading aboard the ocean
19    vessel?
20        A       (Nodding head.)
21        Q       How was that performed?
22        A       From the port of loading to --
23        Q       No, no, from the supplier's premises
24    to the port of loading.
25        A       I don't know.
```

30

```
 1                  M. Breyman
 2        Q       Who would know that?
 3        A       Hapag Lloyd, probably.
 4        Q       Well, your quotation here, Exhibit 1,
 5    says "Pre-carriage to Gdynia."  What does that
 6    mean?
 7        A       The movement of the goods to the port
 8    of -- ex Port Gdynia.
 9        Q       From the supplier's premises; is that
10    right?
11        A       Yes.
12        Q       Well, how did Kuehne & Nagel arrange
13    that with respect to the shipment in question?
14            MR. GELMAN:  There was no testimony
15    that Kuehne & Nagel did arrange it.
16        A       I don't know.
17        Q       Well, did you bill for that service?
18        A       I'd have to verify, I don't know.
19        Q       Can you identify Exhibit 4, sir?
20        A       That is an invoice to our office in
21    Poland.
22        Q       What's that invoice about?
23            THE WITNESS:  Let's step out a
24    second.
25            MR. MAZAROLI:  Let the record reflect
```

31

```
 1                  M. Breyman
 2    that the witness is leaving the room.
 3            (Mr. Gelman and the witness confer
                      Page 13
```

1580Deposition (Kuehne & Nagel) Breymer
4
5      outside the deposition room.)
6          MR. GELMAN:  Would you repeat the
7      last question?
8          (Record read.)
9      Q     Exhibit 4, can you identify it?
10     A     Exhibit 4 is an invoice to our office
       in Poland.
11     Q     Why was that sent?
12     A     It was an internal billing.
13     Q     Does it relate to the shipment in
14     suit?
15     A     It pertains to the shipment, but I
16     don't see how it involves Wild.
17     Q     What does the $4,009.92 for local
18     cartage service and arrangements mean?
19     A     Those were charges passed back and
20     forth internally.
21     Q     For what local cartage, from where to
22     where?
23     A     I believe the origin.
24     Q     Excuse me?
25     A     At the origin.

                                                    32
1                    M. Breyman
2      Q     In Poland?
3      A     Yes.
4      Q     To where?
5      A     I don't know.  To the port of export,
6      I would assume.
7      Q     So Kuehne & Nagel was involved in the
8      transportation of the cargo in suit from the
9      supplier's premises to the port of loading?
10         MR. GELMAN:  Object to the form.
11     Q     It's not a secret, is it?
12     A     I'm still not clear what you're
13     asking.  It's not what we arranged on this end.
14     Q     Who arranged it?
15     A     The forwarding aspect is arranged by
16     Blue Anchor Line.
17     Q     But isn't it indirectly arranged --
18     directly or indirectly arranged by Kuehne &
19     Nagel, Inc.?
20     A     No.
21     Q     No?
22     A     (Shaking head.)
23     Q     Then why has Kuehne & Nagel, Inc.
24     given the quotation we've marked as Exhibit 1 to
25     Wild Flavors?

                                                    33
1                    M. Breyman
2      A     We are collecting the funds for the
3      transportation.
4      Q     And?
5      A     But we are not arranging the
6      transportation on that end.  That is done on that
7      end, not on this end.
8      Q     Who does it on that end?
9      A     That would be through Blue Anchor
10     Line.
11     Q     Through Blue Anchor Line?
12     A     Yes.
                       Page 14

EXHIBIT 3

# KUEHNE + NAGEL

Quote: CHS-RCOT-73YL2G

8th June 2007

Pannotia Vineyards, LLC

*Cargo Routing Door Barcelona to Door US 40ft containers only*

| Destination | Collection Charges | Ocean Freight | Final Delivery |
|---|---|---|---|
| West Columbia, SC | Eur 680 | $2,400 | $475 |
| Elizabeth, NJ | Eur 680 | $2,400 | $475 |
| Mansfield, MA | Eur 680 | $2,400 | $1,100 |
| Additionals | | | |
| AMS | $35 | (Per Bill of lading) | |
| Customs Brokerage | $110 | (Per Bill of lading) | |
| FDA | $25 | (Per Bill of lading) | |

Terms: EXW
Payment Terms: 30 days Freight
Payment Terms: 30 days Duty
Carrier: Blue Anchor Line

Rate's do not include duties, taxes or insurance
Rate's are valid to July 31st 2007

Cargo "Beverages " packed ready for export and meeting export requirments

Presented to: John R Fawcett, 1901 Main Street, Bank of America Building, 17th Floor, Columbia, SC, 29201

Presented by: Robin M Corlett, CHS VI-F, Kuehne+Nagel, 670 Marina Drive, Charleston, SC 29492

000018

Exhibit  3

EXHIBIT 4



KUEHNE + NAGEL, INC.
570 MARINA DR. BLD F, INT'TPK CHB#4455
CHARLESTON, SC 29492
OCEAN IMPORT

KUEHNE+NAGEL

INVOICE

PANIOTIS VINEYARDS
1901 MAIN STREET
BANK AMERICA BLDG, 17TH FLOOR
COLUMBIA, SC 29201
USA

FMC # 1162F

| INVOICE NUMBER | INVOICE DATE |
|---|---|
| CHS0054903 | 07/11/2007 |

| OUR REFERENCE NO | ACCOUNT NUMBER |
|---|---|
| 6322-4676-706.012 | 5808918 |

INDICATE ON REMITTANCE

| 1. SHIPPER/CONSIGNEE | 2. CLIENT REFERENCE | 3. ENTRY NUMBER |
|---|---|---|
| SAI VINEDOS PEDRO NARCOS / | 101-7502319-0 | 101-7502319-0 |

| 4. B/C/WB NO | 5. CARRIER/FLIGHT | 6. ETS/LTD | ETA | 7. ENTRY DATE |
|---|---|---|---|---|
| HJSCBCNW00976003 | QATARI IBN AL FUJA'A | 06/21/2007 | 07/02/2007 | 07/10/2007 |

| 8. ORIGIN POINT | 9. DESTINATION PORT | 10. FINAL DESTINATION | 11. NO OF CONTAINERS |
|---|---|---|---|
| BARCELONA | NEW YORK | | |

| 12. NO OF PCS | 13. DESCRIPTION | 14. WEIGHT | 15. VOLUME |
|---|---|---|---|
| 420 | WHITE WINE | 6720.00 | 7.040 |
| | MH. INV#142/07 | | |

| CODE | DESCRIPTION OF CHARGE | | AMOUNT |
|---|---|---|---|
| 502 | DUTY | | |
| 670 | HARBOR MAINTENANCE FEE | | |
| 640 | MPF | | |
| 003 | FEDERAL EXCISE TAX | | 238.14 |
| 611 | CUSTOMS ENTRY | | 11.48 |
| 614 | FDA NOTIFICATION & SERVICES | | 25.00 |
| 688 | FDA PRIOR NOTIFICATION SERVICES | | 1068.46 |
| 625 | SINGLE ENTRY BOND | | 110.00 |
| | | | 25.00 |
| | | | 25.00 |
| | | | 137.77 |

IMPORTER OF RECORD: PAYMENT TO THE BROKER WILL NOT RELIEVE
YOU OF LIABILITY FOR CUSTOMS CHGS IN THE EVENT THE CHGS ARE
NOT PAID BY THE BROKER. CUSTOMS CHGS MAY BE PAID WITH A
SEPARATE CHECK PAYABLE TO THE "BUREAU OF CUSTOMS & BORDER
PROTECTION" WHICH SHALL BE DELIV. TO CUSTOMS BY THE
BROKER (19 CFR 111.29(B)).

| STATISTICAL NO | | SHIP | PLEASE REMIT TO: | | TOTAL FEES |
|---|---|---|---|---|---|
| | | | KUEHNE + NAGEL, INC. | CLT | |
| MASTER REFERENCE NO | | | P.O. BOX 905779 | | 1640.85 |
| | | | CHARLOTTE, NC 28290-5779 | | |

SEE REVERSE SIDE FOR TERMS AND CONDITIONS

CUSTOMER
PAYMENT DUE BEFORE:
08/10/2007

Exhibit 4



KUEHNE + NAGEL, INC.
670 MARINA DR. BLD F, UNT200 CHS#4455
CHARLESTON, SC 29492
OCEAN IMPORT

KUEHNE+NAGEL

INVOICE

FMC # 1162A

PANYOTIA VINEYARDS
1901 MAIN STREET
BANK AMERICA BLDG. 17TH FLOOR
COLUMBIA, SC 29201
USA

| INVOICE NUMBER | INVOICE DATE |
|---|---|
| CHS0084902 | 07/31/2007 |
| OUR REFERENCE NO. | ACCOUNT NUMBER |
| 6322-4679-706.011 | 5809918 |

INDICATE ON REMITTANCE

| 1. SHIPPER/CONSIGNEE | 2. CLIENT REFERENCE | 3. ENTRY NUMBER |
|---|---|---|
| BODEGAS RODLETAS , S.A. / | 101-7502341-4 | |
| 4. B/L AWB NO. | 5. CARRIER/FLIGHT | 101-7502341-4 |
| HJSCBCNHOK976003   QATARI IBN AL FUJA'A | 6. ETS/ETD   ETA | 7. ENTRY DATE |
| 8. ORIGIN PORT   9. DESTINATION PORT | 06/21/2007   07/02/2007 | 07/05/2007 |
| BARCELONA   NEW YORK | 10. FINAL DESTINATION | 11. NO. OF CONTAINERS |
| 12. NO. OF PCS   13. DESCRIPTION | | |
| 780   RED WINE | 13. WEIGHT   14. VOLUME | |
| REF: INV#073286/227 | 12000.00   5.040 | |

| CODE | DESCRIPTION OF CHARGE | UN | AMOUNT |
|---|---|---|---|
| 590 | SEA FREIGHT | | 3100.00 |
| D02 | DUTY | | 442.26 |
| 670 | HARBOR MAINTENANCE FEE | | 33.99 |
| 640 | MPF | | 40.29 |
| D01 | FEDERAL EXCISE TAX | | 1904.29 |
| 811 | CUSTOMS ENTRY | | 110.00 |
| 814 | FDA NOTIFICATION & SERVICES | | 25.00 |
| 888 | FDA PRIOR NOTIFICATION SERVICES | | 25.00 |
| 953 | COLLECT CHARGES | | 2092.00 |
| 825 | INLAND FREIGHT & ARRANGEMENTS | | 475.00 |
| 581 | AMS SECURITY FEE | | 35.00 |
| 625 | SINGLE ENTRY BOND | | 287.83 |
| 857 | CES EXAMINATION FEE | | 328.00 |

++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++++
IMPORTER OF RECORD: PAYMENT TO THE BROKER WILL NOT RELIEVE
YOU OF LIABILITY FOR CUSTOMS CHGS IN THE EVENT THE CHGS ARE
NOT PAID BY THE BROKER. CUSTOMS CHGS MAY BE PAID WITH A
SEPARATE CHECK PAYABLE TO THE "BUREAU OF CUSTOMS & BORDER
PROTECTION" WHICH SHALL BE DELIV. TO CUSTOMS BY THE
IMPORTER (19 CFR 111.29(B)).

| STATIS/CHG NO. | | PLEASE REMIT TO: |
|---|---|---|
| | | KUEHNE + NAGEL, INC. |
| | | P.O. BOX 905779   CLT |
| WRITE IN REFERENCE OR INVOICE# | | CHARLOTTE, NC 28290-5779 |

| TOTAL USD |
|---|
| 8971.66 |

CUSTOMER
PAYMENT DUE BEFORE:
08/10/2009

SEE REVERSE SIDE FOR TERMS AND CONDITIONS



KUEHNE–NAGEL

FMC # 1169F

| INVOICE NUMBER | INVOICE DATE |
|---|---|
| CHS0084552 | |
| OUR REFERENCE NO. | ACCOUNT NUMBER |
| 6302-4675-706.019 | |

| 1. SHIPPER/CONSIGNEE | 2. CLIENT REFERENCE | 3. ENTRY NUMBER |
|---|---|---|
| BODEGAS ROQUETAS (S.A. / FARNOTIA VINEYARDS | 101-7502360-4 | 101-7502361-4 |

| 4. BIL/AWB NO. | 5. CARRIER/FLIGHT | 6. ETD/ETD | ETA | 7. ENTRY DATE |
|---|---|---|---|---|
| HLCUBC0E0097B104 | QATARI IBN AL FUJA'A | 06/21/2007 | 07/02/2007 | 07/15/2007 |

| 8. ORIGIN PORT | 9. DESTINATION PORT | 10. FINAL DESTINATION | 11. NO. OF CONTAINERS |
|---|---|---|---|
| BARCELONA | NEW YORK | 1800 | |

| 12. NO. OF PCS | 13. DESCRIPTION | 14. WEIGHT | 15. VOLUME |
|---|---|---|---|
| 550  500 | RED WINE | 14200.00  KGS | 3.040  CBM |
| | Ref. INVB073285/226 | | |

| CODE | DESCRIPTION OF CHARGE | UN | AMOUNT |
|---|---|---|---|
| 950 | SEA FREIGHT | | 3100.50 |
| 850 | DUTY | | 375.00 |
| 670 | HARBOR MAINTENANCE FEE | | 26.00 |
| 649 | MPF | | 24.10 |
| 020 | FEDERAL EXCISE TAX | | 1575.91 |
| 611 | CUSTOMS ENTRY | | 110.00 |
| 614 | FDA NOTIFICATION & SERVICES | | 35.00 |
| 399 | FDA PRIOR NOTIFICATION SERVICES | | 35.00 |
| 701 | COLLECTION CHARGES | | 2000.00 |
| 603 | INLAND FREIGHT & ARRANGEMENTS | | 1000.00 |
| 581 | AMS SECURITY FEE | | 25.00 |
| 910 | SINGLE ENTRY BOND | | 140.00 |

IMPORTER OF RECORD: PAYMENT TO THE BROKER WILL NOT RELIEVE
YOU OF LIABILITY FOR CUSTOMS CHGS IN THE EVENT THE CHGS ARE
NOT PAID BY THE BROKER. CUSTOMS CHGS MAY BE PAID WITH A
SEPARATE CHECK PAYABLE TO THE 'BUREAU OF CUSTOMS & BORDER
PROTECTION' WHICH SHALL BE DELIV. TO CUSTOMS BY THE
BROKER. (19 CFR 111.29(b)).

| STATISTICAL | PKGS | SUB | PLEASE REMIT TO: | TOTAL USD |
|---|---|---|---|---|
| | | | KUEHNE + NAGEL, INC. | 8455.51 |
| MASTER | | | P.O. BOX 905779 | |
| | | | CHARLOTTE, NC 28290-5779 | CUSTOMER COPY |

**EXHIBIT 5**

LAW OFFICES OF

# ERNEST H. GELMAN

The Empire State Building
350 Fifth Avenue, Suite 4908
New York, NY 10118
Tel: (212) 332-2345
Fax: (212) 332-8301
Email: egelman@gelmanesq.com

OF COUNSEL
ANN L. CHUSID

MAZAROLI

AUG 1 3 2008

LAW OFFICE

August 11, 2008

David L. Mazaroli, Esq.
11 Park Place – Suite 1214
New York, NY 10007-2801

Dear Mr. Mazaroli:

Enclosed herein please find copy of the terms and conditions contained on Kuehne + Nagel, Inc. invoices.

As for the existence of an agreement between Hanjin Shipping and one of the Kuehne & Nagel defendants, including Blue Anchor Line, further inquiry has been made. I note however that Mr. Heard promised at the time of the last court hearing to inquire as to the existence of such an agreement.

Very truly yours,

Ernest H. Gelman

EHG/ll
cc:    Birgit Liehmann

Exhibit _5_

## TERMS AND CONDITIONS OF SERVICE

These terms and conditions of service constitute a legally binding contract between the "Company" and the "Customer". In the event the Company renders services and issues a document containing Terms and Conditions governing such services, the Terms and Conditions set forth in such other document(s) shall govern those services.

**1. Definitions.**
(a) "Company" shall mean *Kuehne & Nagel, Inc.*, its subsidiaries, related companies, agents and/or representatives;
(b) "Customer" shall mean the person for which the Company is rendering service, as well as its agents and/or representatives, including, but not limited to, shippers, importers, exporters, carriers, secured parties, warehousemen, buyers and/or sellers, shipper's agents, insurers and underwriters, break-bulk agents, consignees, etc. It is the responsibility of the Customer to provide notice and copy(s) of these terms and conditions of service to all such parties or representatives;
(c) "Documentation" shall mean all information received directly or indirectly from Customer, whether in paper or electronic form;
(d) "Ocean Transportation Intermediaries" ("OTI") shall include an "ocean freight forwarder" and a "non-vessel operating carrier";
(e) "Third parties" shall include, but not be limited to, the following: "carriers, truckmen, cartmen, lightermen, forwarders, OTIs, customs brokers, agents, warehousemen and others to which the goods are entrusted for transportation, cartage, handling and/or delivery and/or storage or otherwise".

**2. Company as agent.** The Company acts as the "agent" of the Customer for the purpose of performing duties in connection with the entry and release of goods, post entry services, the securing of export licenses, the filing of export documentation on behalf of the Customer and other dealings with Government Agencies; as to all other services, Company acts as an independent contractor.

**3. Limitation of Actions.**
(a) Unless subject to a specific statute or international convention, all claims against the Company for a potential or actual loss, must be made in writing and received by the Company, within ninety (90) days of the event giving rise to claim; the failure to give the company timely notice shall be a complete defense to any suit or action commenced by Customer.
(b) All suits against Company must be filed and properly served on Company as follows:
   (i) For claims arising out of ocean transportation, within one (1) year from the date of the loss;
   (ii) For claims arising out of air transportation, within two (2) years from the date of the loss;
   (iii) For claims arising out of the preparation and/or submission of an import entry(s), within seventy five (75) days from the date of liquidation of the entry(s);
   (iv) For any and all other claims of any other type, within two (2) years from the date of the loss or damage.

**4. No Liability For The Selection or Services of Third Parties and/or Routes.** Unless services are performed by persons or firms engaged pursuant to express written instructions from the Customer, Company shall use reasonable care in its selection of third parties, or in selecting the means, route and procedure to be followed in the handling, transportation, clearance and delivery of the shipment; advice by the Company that a particular person or firm has been selected to render services with respect to the goods, shall not be construed to mean that such person or firm will render such services nor does Company assume responsibility or liability for any action(s) and/or inaction(s) of such third parties and/or its agents, and shall not be liable for any delay or loss of any kind, which occurs while a shipment is in the custody or control of a third party or the agent of a third party; all claims in connection with the Act of a third party shall be brought solely against such party and/or agents; in connection with any such claim, the Company shall reasonably cooperate with the Customer, which shall be liable for any charges or costs incurred by the Company.

**5. Quotations Not Binding.** Quotations as to fees, rates of duty, freight charges, insurance premiums or other charges given by the Company to the Customer are for informational purposes only and are subject to change without notice; no quotation shall be binding upon the Company unless the Company in writing agrees to undertake the handling or transportation of the shipment at a specific rate or amount set forth in the quotation and payment arrangements are agreed to between the Company and the Customer.

**6. Reliance On Information Furnished.**
(a) Customer acknowledges that it is required to review all documents and declarations prepared and/or filed with the Customs Service, other Government Agency and/or third parties, and will immediately advise the Company of any errors, discrepancies, incorrect statements, or omissions on any declaration filed on Customers behalf;
(b) In preparing and submitting customs entries, export declarations, applications, documentation and/or export data to the United States and/or a third party, the Company relies on the correctness of all documentation, whether in written or electronic format, and all information furnished by Customer; Customer shall use reasonable care to insure the correctness of all such information and shall indemnify and hold the Company harmless from any and all claims asserted and/or liability or losses suffered by reason of the Customer's failure to disclose information or any incorrect or false statement by the Customer upon which the Company reasonably relied. The Customer agrees that the Customer has an affirmative non-delegable duty to disclose any and all information required to import, export or enter the goods.

**7. Declaring Higher Value to Third Parties.** Third parties to whom the goods are entrusted may limit liability for loss or damage, the Company will request excess valuation coverage only upon specific written instructions from the Customer, which must agree to pay any charges therefor; in the absence of written instructions or the refusal of the third party to agree to a higher declared value, at Company's discretion, the goods may be tendered to the third party, subject to the terms of the third party's limitations of liability and/or terms and conditions of service.

**8. Insurance.** Unless requested to do so in writing and confirmed to Customer in writing, Company is under no obligation to procure insurance on Customer's behalf; in all cases, Customer shall pay all premiums and costs in connection with procuring such coverage.

**9. Disclaimers; Limitation of Liability.**
(a) Except as specifically set forth herein, Company makes no express or implied warranties in connection with its services;
(b) Subject to (c) below, Customer agrees that in connection with any and all services performed by the Company, the Company shall only be liable for its negligent acts, which are the direct and proximate cause of any injury to Customer, including loss or damage to Customer's goods, and the Company shall in no event be liable for the acts of third parties;
(c) In connection with all services performed by the Company, Customer may obtain additional liability coverage, up to the actual or declared value of the shipment or transaction, by requesting such coverage and agreeing to make payment therefor, which request must be confirmed in writing by the Company prior to rendering services for the covered transaction(s).
(d) In the absence of additional coverage under (b) above, the Company's liability shall be limited to the following:
   (i) where the claim arises from activities other than those relating to customs brokerage, $50.00 per shipment or transaction, or
   (ii) where the claim arises from activities relating to "Customs business", $50.00 per entry or the amount of brokerage fees paid to Company for the entry, whichever is less;
(e) In no event shall Company be liable or responsible for consequential, indirect, incidental, statutory or punitive damages even if it has been put on notice of the possibility of such damages.

**10. Advancing Money.** All charges must be paid by Customer in advance unless the Company agrees in writing to extend credit to customer; the granting of credit to a Customer in connection with a particular transaction shall not be considered a waiver of this provision by the Company.

**11. Indemnification/Hold Harmless.** The Customer agrees to indemnify, defend, and hold the Company harmless from any claims and/or liability arising from the importation or exportation of customers merchandise and/or any conduct of the Customer, which violates any Federal, State and/or other laws, and further agrees to indemnify and hold the Company harmless against any and all liability, loss, damages, costs, claims and/or expenses, including but not limited to reasonable attorney's fees, which the Company may hereafter incur, suffer or be required to pay by reason of such claims, in the event that any claim, suit or proceeding is brought against the Company, it shall give notice in writing to the Customer by mail at its address on file with the Company.

**12. C.O.D. or Cash Collect Shipments.** Company shall use reasonable care regarding written instructions relating to "Cash/Collect" on "Deliver (C.O.D.)" shipments, bank drafts, cashier's and/or certified checks, letter(s) of credit and other similar payment documents and/or instructions regarding collection of monies but shall have no liability if the bank or consignee refuses to pay for the shipment.

**13. Costs of Collection.** In any dispute involving monies owed to Company, the Company shall be entitled to all costs of collection, including reasonable attorney's fees and interest at 15% per annum or the highest rate allowed by law, whichever is less, unless a lower amount is agreed to by Company.

**14. General Lien and Right To Sell Customer's Property.**
(a) Company shall have a general and continuing lien on any and all property of Customer coming into Company's actual or constructive possession or control for monies owed to Company with regard to the shipment on which the lien is claimed, or prior shipment(s) and/or both;
(b) Company shall provide written notice to Customer of its intent to exercise such lien, the exact amount of monies due and owing, as well as any on-going storage or other charges; Customer shall notify all parties having an interest in its shipment(s) of Company's rights and/or the exercise of such lien.
(c) Unless, within thirty days of receiving notice of lien, Customer posts cash or letter of credit at sight, or, if the amount due is in dispute, an acceptable bond equal to 110% of the value of the total amount due, in favor of Company, guaranteeing payment of the monies owed, plus all storage charges accrued or to be accrued, Company shall have the right to sell such shipment(s) at public or private sale or auction and any net proceeds remaining thereafter shall be refunded to Customer.

**15. No Duty To Maintain Records For Customer.** Customer acknowledges that pursuant to Sections 508 and 509 of the Tariff Act, as amended, (19 USC § 1508 and 1509) it has the duty and is solely liable for maintaining all records required under the Customs and/or other Laws and Regulations of the United States; unless otherwise agreed to in writing, the Company shall only keep such records that it is required to maintain by Statute(s) and/or Regulation(s), but not act as a "recordkeeper" or "recordkeeping agent" for Customer.

**16. Obtaining Binding Rulings, Filing Protests, etc.** Unless requested by Customer in writing and agreed to by Company in writing, Company shall be under no obligation to undertake any pre- or post Customs release action, including, but not limited to, obtaining binding rulings, advising of liquidations, filing of petition(s) and/or protests, etc.

**17. Preparation and Issuance of Bills of Lading.** Where Company prepares and/or issues a bill of lading, Company shall be under no obligation to specify therein the number of pieces, packages and/or cartons, etc.; unless specifically requested to do so in writing by Customer or its agent and Customer agrees to pay for same, Company shall rely upon and use the cargo weight supplied by Customer.

**18. No Modification or Amendment Unless Written.** These terms and conditions of service may only be modified, altered or amended in writing signed by both Customer and Company; any attempt to unilaterally modify, alter or amend same shall be null and void.

**19. Compensation of Company.** The compensation of the Company for its services shall be included with and is addition to the rates and charges of all carriers and other agencies selected by the Company to transport and deal with the goods and such compensation shall be exclusive of any brokerage, commissions, dividends, or other revenue received by the Company from carriers, insurers and others in connection with the shipment. On ocean exports, upon request, the Company shall provide a detailed breakout of the components of all charges assessed and a true copy of each pertinent document relating to these charges. In any referral for collection or action against the Customer for monies due the Company, upon recovery by the Company, the Customer shall pay the expenses of collection and/or litigation, including a reasonable attorney fee.

**20. Severability.** In the event any Paragraph(s) and/or portions(s) hereof is found to be invalid and/or unenforceable, then in such event the remainder hereof shall remain in full force and effect.

**21. Governing Law; Consent to Jurisdiction and Venue.** These terms and conditions of service and the relationship of the parties shall be construed according to the laws of the State of *NEW YORK* without giving consideration to the principals of conflict of law. *Customer and Company*
(a) irrevocably consent to the jurisdiction of the United States District Court and the State courts of *NEW YORK*;
(b) agree that any action relating to the services performed by Company, shall only be brought in said courts;
(c) consent to the exercise of in personam jurisdiction by said courts over it, and
(d) further agree that any action to enforce a judgement may be instituted in any jurisdiction.
Copyrighted by the National Customs Brokers & Forwarders Association of America, Inc. (Revised 04/00)

**EXHIBIT 6**

Ted CHSZX
**Asunto:** RE: Document - Capital Group / - Pannotia Vineyards
**Importancia:** Alta

Juan,
I hope that all is well, as you will see from the attached email the first container for Mansfield, MA has a problem and the wine with in the container has cooked because the container was not lined. As you will see in my first instructions to you I requested that you contact the shippers regarding "Lining" the container....... Please advise who loaded the containers shipper or KN?

Robin Maxwell Corlett
Transpacifc Tradelane Manager, North and South Carolina - USA (CHS VI-F)
KUEHNE + NAGEL INC,
670 Marina Drive, Units 200 & 201, Building F,
Charleston, South Carolina, USA, 29492

Tel: 001 843 884 5550 ext.2340
Mob: 001 843 412 8972
Fax: 001 843 884 5497
E-mail: robin.corlett@Kuehne-Nagel.com

Http: www.Kn-Portal.com

Global logistics network: 46'000 Logistics Specialists, strategically placed at 830 locations in more than 100 countries

-----Original Message-----
**From:** Robin Corlett / CHS VI-F [mailto:robin.corlett@kuehne-nagel.com]
**Sent:** Monday, June 11, 2007 1:15 PM
**To:** Juan Fernandez
**Cc:** Peter. Mueller; Bcn SE Margarita de Madrid; federico.falcone@kuehne-nagel.com; Mike Harper
**Subject:** Document - Capital Group / - Pannotia Vineyards
**Importance:** High

Juan,
I hope that all is well, As per our recent communication regarding Pannotia Vineyards (attached) Pannotia, have now elected to use Kuehne+Nagel for there sea-freight shipment from Spain and Argentina.
Pannotia www.pannotiavineywards.com , is part of the capital wine and beverage group www.capitalbev.com the first 3 shipments that we will be handling are to be seen as a trial shipment for the entire group, these will be watched and monitored closely.... Their current service provider is UTC, the volume for the group is +400Teus.

Can you make contact with the supplier today contact details: (They are awaiting your contact)

Roqueta / Masies Avinyo
Centro de Distribucio
Eje Transversal C-25, salida 151
08179 Santa Maria d'Horta d'Avinyo
Barcelona (Spain)

Logistic responsable: Sra. Gloria Montagut
Tel. +34 93 874 35 11
Fax +34 93 873 72 04

Exhibit 6

The first three shipments will be for three separate DC's (The address's are attached)

- Columbia SC.
  - o Arrange shipment to Charleston, SC port. Terminate at port
  - o KN CHS will arrange final delivery
  - o BAL Bill of Lading
    - Consignee: Capital Wine and Beverage, West Columbia, SC
    - Notify Party: Pannotia Vineyards, Columbia, SC
    - Delivery Agent: KN CHS
  - o Transmit Knie to KN CHS
  - o Logical Code TBA, this has been applied for and I will advise
  - o Net and Sell rates are attached
    - P/S 50/50 of Sea Freight

- Elizabeth NJ.
  - o Arrange shipment to NewYork, NY port. Terminate at port
  - o KN CHS will arrange final delivery
  - o BAL Bill of Lading
    - Consignee: Gallo Sales of New Jersey, NJ
    - Notify Party: Pannotia Vineyards, Columbia, SC
    - Delivery Agent: KN CHS
  - o Transmit Knie to KN CHS
  - o Net and Sell rates are attached
    - P/S 50/50 of Sea Freight

- Mansfield, MA
  - o Arrange shipment to NewYork, NY port. Terminate at port
  - o KN CHS will arrange final delivery
  - o BAL Bill of Lading
  - o
    - Consignee: Commonwealth Wine and Spirits
    - Notify Party: Pannotia Vineyards, Columbia, SC
    - Delivery Agent: KN CHS
  - o Transmit Knie to KN CHS
  - o Net and Sell rates are attached
    - P/S 50/50 of Sea Freight



Also the consignee is asking that the containers should be "Lined"? Please ensure you ask the shipper regarding this request,
Note that Mike.Harper@Kuehne-Nagel.com will be the account manager for this client and to ensure that he is cc'd on all communication regarding this account

please advise your feedback thanks for the help Robin

Thanks & Best Regards.

10/18/2007

Robin Maxwell Corlett - CHS VI-F
Transpacifc Tradelane Manager, North and South Carolina.
KUEHNE + NAGEL INC,
670 Marina Drive, Units 200 & 201, Building F,
Charleston, South Carolina, USA, 29492

Tel: 001 843 884 5550 ext.2340
Mob: 001 843 412 8972
Fax: 001 843 884 5497
E-mail: robin.corlett@Kuehne-Nagel.com

Http: www.Kn-Portal.com

Global logistics network: 46'000 Logistics Specialists, strategically placed at 830 locations in more
than 100 countries

10/18/2007